UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
In re:                                                             :   Chapter 7
                                                                   :
LAWRENCE OMANSKY,                                                  :   Case No. 18-13809 (LGB)
                Debtor.                                    :
------------------------------------------------------------------ :
                                                                   x

JOHN S. PEREIRA, CHAPTER 7 TRUSTEE FOR                             :
THE ESTATE OF LAWRENCE OMANSKY,                                    :   Adv. Pro. No. 20-01091 (LGB)
                                                                   :
                Plaintiff.                                 :
vs.                                                                :
                                                                   :
NICOLENA NATOLI OMANSKY, ROBERT                                    :
OMANSKY, AND SALLY OMANSKY,                                        :
                Defendants.                                :
                                                                   :
------------------------------------------------------------------ x

## MEMORANDUM OPINION AND ORDER

**APPEARANCES**
AKERMAN LLP
Counsel for the Plaintiff/Trustee
1251 Avenue of the Americas, 37th Floor
New York, NY 10020
By:   John P. Campo
       john.campo@akerman.com

       Michael Napoli
       michael.napoli@akerman.com

REED SMITH LLP
Counsel for the Defendant
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
By:   Derek M. Osei-Bonsu
       DOsei-Bonsu@reedsmith.com

       Derek Baker
       dbaker@reedsmith.com

1

**HON. LISA G. BECKERMAN**
**UNITED STATES BANKRUPTCY JUDGE**

I.  Procedural Background and Findings of Fact

On November 27, 2018 (the "Petition Date"), Lawrence Omansky (the "Debtor") commenced this case (the "Case") by filing a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York. On November 28, 2018, John S. Pereira (the "Trustee" or "Pereira") was appointed as Trustee of the Debtor's estate.

On May 22, 2020, the Trustee commenced this adversary proceeding against Nicolena Natoli Omansky (the "Defendant" or "Natoli"), the former wife of the Debtor, with the filing of a complaint [ECF 1], later superseded by an amended complaint [ECF 10] (the "Complaint") filed on July 7, 2020.[1] By the filing of the Complaint, the Trustee sought entry of a judgment avoiding and preserving for the benefit of the Debtor's estate a $900,000 secured claim asserted by Natoli against the estate under Bankruptcy Code §§ 544, 548, 550, and 551 and New York Debtor & Creditor Law ("NYDCL") §§ 273, 274, 275, and 276; the equitable subordination of claims held by Natoli to all other claims of the Debtor's estate under Bankruptcy Code § 510; a declaratory judgment in favor of the Trustee that Natoli is not a secured creditor due to her failure to properly perfect her claim; and a declaratory judgment in favor of the Trustee determining that Natoli's secured claim is void, or, in the alternative, determining that Natoli is not entitled to interest on her claim for her failure to take any action to enforce it. The claims raised in the Complaint involve a prepetition mortgage note held by Natoli in the principal amount of $900,000 secured by a third lien (the "160 Chambers Lien") on the cooperative shares (the "160 Chambers Shares") and proprietary lease (the "Proprietary Lease," and together with the 160 Chambers Shares, the "160 Chambers Collateral") owned by the Debtor's estate relating to a residential cooperative property located at 160 Chambers Street (the "160 Chambers Co-Op") in Manhattan. Pre-Trial Order (defined below) at 3. Natoli timely filed a proof of claim asserting her secured claim against the Debtor's estate in the amount of $900,000 on March 9, 2019. Plaintiff's Exhibit 4, generally.

On June 23, 2020, Natoli filed an answer [ECF 4] to the Complaint. On April 21, 2022, the parties filed a joint pre-trial order [ECF 42] (the "Pre-Trial Order") adopting a series of agreements and directions as to the stipulated facts, parties' contentions, and evidence to be presented at trial. On May 17, 2022, counsel for the Defendant filed the declaration of Natoli [ECF 48]. On the same day, counsel for the Trustee filed the declarations of Pereira [ECF 49] and the Debtor [ECF 50].

On May 23 and 24, 2022, this Court held a two-day trial on the claims asserted in the Complaint, wherein 21 exhibits, including the various declarations, were moved by the parties and entered into evidence as part of the trial record. In addition, the Trustee, the Debtor and Natoli each testified at the trial.

---

[1] The Complaint additionally named Robert Omansky and Sally Omansky (the "Settling Defendants"), the Debtor's brother and sister-in-law, as defendants. On February 9, 2021, the Court entered an order approving a settlement agreement among the Trustee and the Settling Defendants dismissing the adversary proceeding solely as to the Settling Defendants [ECF 20].

2

At trial, the Court determined that Counts I and II of the Complaint, brought under Bankruptcy Code § 548, were inapplicable to the Defendant because the alleged fraudulent transfers did not occur within two years of the Petition Date. Transcript of Trial on May 23, 2022 ("May 23 Tr.") at 14:5-15:17. At the culmination of the trial, the Defendant requested a directed verdict on the remaining counts. Transcript of Trial on May 24, 2022 ("May 24 Tr.") at 74:4-5. The Court granted Defendant's request for a directed verdict as to Count VII of the Complaint for Equitable Subordination under Bankruptcy Code § 510(c), and denied the directed verdict as to the remaining counts in the Complaint. *See* Order Granting Directed Verdict on Equitable Subordination [ECF 51] (the "Directed Verdict Order"), at ¶ 1. On May 26, 2022, the Court entered the Directed Verdict Order.  Counts III-VI remain and are analyzed below.

     A.  Background

Although the Debtor and Natoli have slightly different recollections as to the timeline of their relationship, it is clear from the testimony that they married in 1983, separated sometime in the mid-to-late 1990s, and were divorced by 2008. Declaration of Natoli ("Natoli Decl.") at ¶ 5-6; May 23 Tr. 115:4-7; 255: 20-24. Natoli reports that since their divorce, she and the Debtor have maintained an amicable relationship for the benefit of their three (now-adult) children. Natoli Decl. ¶ 7; May 23 Tr. 213:23-214:1-9. Together, Natoli and the Debtor, a Manhattan criminal defense attorney and real estate investor formerly licensed as a real estate broker, have been involved in at least three real estate projects over the course of their nearly forty-year relationship. May 23 Tr. 116:5-8; 212:17-24; 225:14-19.

According to the Debtor's testimony, the first of these projects took place in the late-1980s and involved two ground floor units at 49-51 Warren Street, New York, NY. Declaration of the Debtor ("Debtor Decl.") at ¶ 4; May 23 Tr. 116:18-19. In order to pursue this project, the Debtor and Natoli formed Tribeca Realty LLC, with Natoli investing $50,000 in exchange for an ownership interest. Debtor Decl. ¶ 4; May 23 Tr. 118:2-13. Natoli also loaned Tribeca Realty LLC $650,000 toward renovating the building and converting it into a condominium. Debtor Decl. ¶ 4. Natoli testified that, in exchange for this loan, she was given the option to either be paid back or receive as consideration two ground floor units, 1E and 1F, which later became a combined condominium unit (the "49 Warren Condo"). May 23 Tr. 25:12-14; 118:19-24. A few years after making her initial investment, Natoli exercised the option to forgive her loan in exchange for ownership of the 49 Warren Condo, which served as her family home until she sold it for $3.125 million in 2019. May 23 Tr. 118:22-119:2; 120:21-23. At some point, Natoli also invested approximately $10,000 in a project involving the Debtor concerning a property on 89th Street in New York, NY. Debtor Decl. at ¶ 5.

     B.  The Warren Penthouse Transaction

The third real estate project, and the project that gave rise to the transaction at issue in this adversary proceeding, took root in March 2008, when the Debtor and Natoli, together also with Robert Omansky and Leona Hollar, a former girlfriend of the Debtor, created another real estate limited liability company, 6 W 37 St Realty LLC ("Realty"), for the purpose of acquiring units 5W and 6W at 49-51 Warren Street (the "49 Warren Penthouse"). Natoli Decl. ¶ 12,14; Debtor

3

Decl. ¶ 6. Natoli testified that when the Debtor approached her with this investment opportunity, he told her that he "needed the help" to complete the project and feared that he would otherwise "lose" out on the 49 Warren Penthouse without her as a co-guarantor. Natoli Decl. ¶ 13; May 23 Tr. 122:9-19. Thus, as she testified, Natoli received a 30% ownership interest in Realty in exchange for pledging the 49 Warren Condo as collateral and for agreeing to personally guarantee a loan that would be taken out to purchase and refurbish the 49 Warren Penthouse. May 23 Tr. 125:24-126:5; 229:19-22; Plaintiff's Exhibit 1/Defendant's Exhibit A, at Schedule A; Defendant's Exhibit C, generally. Shortly thereafter, the Debtor bought the ownership interests of Robert Omansky and Leona Hollar, resulting in him holding the remaining 70% ownership interest in Realty. Debtor Decl. ¶ 6.

i. The Realty Loan Agreement

On March 18, 2008, Realty entered into a $3.385 million Loan Agreement (the "Realty Loan Agreement") with Hudson Valley Bank N.A. ("Hudson") with the Debtor and Natoli as co-guarantors. Natoli Decl. ¶ 17; Debtor Decl. ¶ 7; Defendant's Exhibit B, generally; Defendant's Exhibit C, generally; Defendant's Exhibit D, generally. Under the Realty Loan Agreement, the Debtor and Natoli each separately provided a guarantee (each a "Guarantee" and together, the "Guarantees") to pay back the entire loan obligation (the "Realty Loan"), if called upon. Natoli Decl. ¶ 17; Debtor Decl. ¶7; May 23 Tr. 52:4-14; May 24 Tr. 24:1-3. The Realty Loan was evidenced by a promissory note executed by Realty in favor of Hudson (the "Realty Note"). Natoli Decl. ¶ 17. As mentioned above, this Realty Note was collateralized not only by a mortgage granted by Realty on the 49 Warren Penthouse (the "49 Warren Penthouse Mortgage"), but also, as additional security for the Realty Loan, a mortgage granted personally by Natoli on the 49 Warren Condo (the "49 Warren Condo Mortgage," and together with the 49 Warren Penthouse Mortgage, the "49 Warren Mortgages") that she owned and occupied. Natoli Decl. ¶ 17; May 23 Tr. 125:24-126:5; 229:19-22. Proceeds of the Realty Loan Agreement were used both to purchase the 49 Warren Penthouse for $2.65 million, and to pay off the pre-existing mortgage encumbering the 49 Warren Condo in an amount "around" $360,000, by Natoli's testimony. Debtor Decl. ¶ 7; May 23 Tr. 123:18-22; 128:25-129:1-20.

ii. The Realty Operating Agreement

In agreeing to enter into the Realty Loan Agreement in exchange for a membership interest in Realty, Natoli avers that she acted in reliance on the alleged indemnification provisions of the Operating Agreement of 6 W 37 St Realty LLC drafted by the Debtor (the "Realty Operating Agreement"). Natoli Decl. ¶ 19. The provision in question, attached to the Realty Operating Agreement as Schedule A, provides as follows:

> LAWRENCE A. OMANSKY, is receiving 50% of the deal because he is guaranteeing said [L]oan, has arranged for the purchase of the unit, the sale of the unit, and will cover any losses over and above members initial investment.
>
> NATOLI OMANSKY is receiving 30% of the shares in consideration for placing her unit as additional collateral for said loan and will be personally guaranteeing said loan.

4

Plaintiff's Exhibit 1/Defendant Exhibit A at Schedule A.

As Natoli understands this provision, the Debtor "agreed to indemnify any member of Realty . . . for any expenses paid on behalf of Realty by such member in excess of the percentage of such member's ownership share of membership units of Realty." Natoli Decl. ¶ 19. Natoli further testified that, under her interpretation, "if the mortgage fell through, if something happened with the property, that [she] was responsible for 30% [of the entire loan amount]." May 23 Tr. 128:16-18. Natoli testified that this was the Debtor's "promise" to her to "honor his debt" to her. May 23 Tr. 207:18-208:13.

Paragraphs 8.1 and 8.9 of the Realty Operating Agreement, reproduced below, provide a seemingly contrary reading regarding indemnification and repayment:

> 8.1 Initial Contributions. Each member shall make the Initial Capital Contribution described for that Member on Schedule A at the time and on the terms specified in Schedule A and shall perform that Member's Commitment, and shall receive the number of Units of Membership interest and Sharing Ratio described for that Member on Schedule A.
>
> . . .
>
> 8.9 No Personal Liability. The Managing Member [the Debtor] shall have no personal liability for the repayment of any Capital Contributions of any member.

Plaintiff's Exhibit 1 / Defendant Exhibit A ¶ 8.1, 8.9.

Based upon this language, the Trustee asserts that Natoli's investment in Realty should be understood as a capital contribution that the Debtor had not indemnified and had no obligation to repay. May 24 Tr. 82:3-8.

While the Debtor confirmed that he understood Natoli's guaranty and pledge of the 49 Warren Condo to be her "initial capital contribution," he also agrees with her interpretation, testifying that he did indeed draft Schedule A to guarantee losses over members' initial investment. Debtor's Decl. ¶ 8; May 23 Tr. 229:15-22.

### iii. The Realty Enforcement Action

On October 16, 2009, the Realty Loan matured by its own terms. Natoli Decl. ¶ 22. In or around September 2010, Realty was notified by Hudson that it was in default under the Realty Loan and that the remedies under the Realty Note and 49 Warren Mortgages would be enforced unless the default was timely cured. Natoli Decl. ¶ 22; Defendant's Exhibit J-1 ¶ 14. Realty, however, continued to fail to meet its obligations under the Realty Loan, prompting Hudson to bring suit against Realty, Natoli, and the Debtor (the "Realty Enforcement Action") in the Supreme Court of the State of New York, County of New York (the "State Court") in November 2010. Natoli Decl. ¶ 22; Defendant's Exhibit J-1, generally. By the Complaint, the Realty Enforcement Action sought to enforce the Realty Note, 49 Warren Mortgages, and Guarantees. Defendant's Exhibit J-1 ¶ 18-19, 33-34.

5

Even though the Debtor appeared as counsel on behalf of all of the defendants in the Realty Enforcement Action before the State Court, Natoli testified to having only learned about the suit when she later received a notice that the State Court had, on January 23, 2012, entered an order granting summary judgment (the "Summary Judgment Order") to WEXA1 HBV ("WEXA"), an entity to which the Realty Loan, Realty Note, 49 Warren Mortgages, and Guarantees had been assigned at some point during the pendency of the suit. Natoli Decl. ¶ 23; May 23 Tr. 151:21-22; 153:3-6; Defendant's Exhibit J-2, generally. By the time the Summary Judgment Order was entered, the 49 Warren Penthouse was no longer being foreclosed on, having been sold by Realty in or around July 2011 for $2.625 million. Debtor Decl. ¶ 9; May 23 Tr. 153:7-13; 154: 19-22; 233:2-9; Defendant's Exhibit J-2, pg. 2. However, the proceeds from the sale of the 49 Warren Penthouse still left a $3.191 million deficiency balance on the Realty Loan, and the Summary Judgment Order awarded WEXA the right to foreclose on the 49 Warren Condo as a consequence. Debtor Decl. ¶ 9; May 23 Tr. 165:2-4; Defendant's Exhibit J-2, pgs. 13-15.

Around the time that the Summary Judgment Order was entered, Realty, Natoli, and the Debtor entered into a forbearance agreement where, as the Debtor testified, "[WEXA] agreed to wait a year while [Natoli, and the Debtor] tried to salvage things." May 23 Tr. 234:1-6; May 24 Tr. 20:7-10. Shortly thereafter, Natoli entered into negotiations with WEXA in an attempt to reach a compromise as to the remaining balance on the Realty Loan and protect her home from foreclosure. Natoli Decl. ¶ 24; May 23 Tr. 159:11-18; 164:1. While the Debtor initially represented Natoli in these negotiations, she later hired other representation. Natoli Decl. ¶ 24; Debtor Decl. ¶ 9; May 23 Tr. 159:6-8.

      iv. The 160 Chambers Mortgage and the Two-Step Transaction

In 2012, WEXA asked for a payment of $1.65 million in exchange for the release of the 49 Warren Condo Mortgage. Natoli Decl. ¶ 26. Natoli, believing that this amount was well above the 30% share that she was obligated for under the Realty Operating Agreement, and angry that she was going to be made to pay this settlement to protect her home from foreclosure, insisted— with what she testified to be her "divorced wife tone"—on "something" from the Debtor in return. Natoli Decl. ¶ 27; May 23 Tr. 181:12-19. The Debtor further testified that Natoli said that she would withhold the payment necessary to stop foreclosure unless she was given the lien on the 160 Chambers Co-Op that she ultimately did receive from him, as she was not "100 percent trusting" of her former husband and wanted "to make sure that everything was on the up and up." May 23 Tr. 244:16-19; May 24 Tr. 50:23-51:24.

After a few months, the Debtor acquiesced and, on September 21, 2012, executed a note in the amount of $900,000 in favor of Natoli (the "September 2012 Note") and executed a mortgage seeking to secure the September 2012 Note with the 160 Chambers Lien on the 160 Chambers Co-Op (the "160 Chambers Mortgage"). Natoli Decl. ¶ 30; Debtor Decl. ¶ 10; May 23 Tr. 177:13-178:8; Defendant's Exhibit F, generally; Defendant's Exhibit G, generally. The Debtor executed the 160 Chambers Mortgage and failed to contemporaneously file a UCC-1 statement even though the 160 Chambers Co-Op is a cooperative apartment. Debtor Dec. ¶ 10, 15; Declaration of Pereira ("Pereira Decl.") at ¶ 3; May 23 Tr. 242:8-243:14. In Natoli's words, in executing the September 2012 Note and 160 Chambers Mortgage, the Debtor "reiterated his obligation [under the Realty

6

Operating Agreement] to reimburse [her] for any amounts [she] might have to pay WEXA greater than [her] thirty percent (30%) interest in Realty." Natoli Decl. ¶ 29. The Debtor testified that he had agreed that he was responsible for a payment of 70% of Natoli's settlement, and that they had reached the $900,000 amount because that was 70% of $1.6 million, less the approximately $400,000 that she paid to cover her loan that Hudson had originally paid off so that they could have a first lien on the property. May 23 Tr. 234:23-25; 235:13-19.

On April 11, 2013, about seven months after executing the September 2012 Note, the Debtor "caused the New York City Department of Finance (the "NYC DOF") to record a UCC-1 financing statement encumbering the 160 Chambers Shares and the Proprietary Lease in favor of [Natoli]." Debtor Decl. ¶ 15. The Debtor testified that the gap between the execution of the September 2012 Note and the filing of the UCC-1 financing statement was the result of him "screwing up" the paperwork and "having to go back to [the NYC DOF] and try and figure out the right way" to complete the recording several times after his unsuccessful submissions were "rejected two or three times." May 23 Tr. 242:19-23. Essentially, the Debtor explained, he "didn't get it all right." May 23 Tr. 243:14.

      v. The WEXA Settlement

Natoli testified that in December 2012, after several months of continued negotiations and three months after the Debtor executed the September 2012 Note and the 160 Chambers Mortgage, Natoli reached a settlement with WEXA (the "WEXA Settlement") agreeing to pay WEXA approximately $1.65 million—$1.2 million to be paid on or before December 24, 2012, plus an additional $425,000, plus interest, by the end of 2013. Natoli Decl. ¶ 28; May 23 Tr. 165:11-19; 184:14-19; Plaintiff's Exhibit 2/Defendant's Exhibit H, generally. In return, the WEXA Settlement provided that Natoli would be released from all obligations under the 49 Warren Condo Mortgage. May 23 Tr. 163:18-21; 166:3-8. The WEXA Settlement did not, however, provide for the release of the Debtor, stating as follows:

> Notwithstanding anything to the contrary contained in this letter agreement . . . nothing contained in this letter agreement . . . shall be an agreement, or shall be deemed or construed in any way whatsoever as an agreement, by the Lender or any other party, person or entity of any kind whatsoever to impair, prejudice, waive, release, discharge, diminish or otherwise adversely affect in any kind whatsoever any claims benefits, indebtedness, indemnities, rights, remedies or recourses of any kind whatsoever available to the Lender or to any other party, person or entity of any kind whatsoever against or as to the [Realty], [the Debtor] or any other party, person or entity of any kind whatsoever, other than with regard to only [Natoli] . . .

Plaintiff's Exhibit 2/Defendant's Exhibit H ¶ 10.

Despite this language, and the fact that the Debtor himself admits that he was neither party to the WEXA Settlement, nor ever made any payments to WEXA pursuant to the WEXA Settlement or otherwise, the Debtor testified that he believed, based on alleged oral representations from WEXA, that he was also "being released as soon as [Natoli] made the full payment." May 23 Tr. 234: 11-13, 20-22; 237:23-238:4; May 24 Tr. 24:4-22. The Debtor also testified that WEXA has

7

not, at any time since 2012, attempted to collect against him, nor did WEXA file a proof of claim in the Debtor's Case. May 24 Tr. 64:9-18.

It is not clear from her testimony whether Natoli agreed with the Debtor's interpretation of the WEXA Settlement or understood the release provided to her by the WEXA Settlement to extend to the Debtor. May 23 Tr. 166:3-12.

      C.  Debtor's Financial Condition at the Time of the Transaction

As counsel for the Defendant noted at trial, evidence as to what the Debtor's solvency or financial situation looked like in 2012 is "murky at best." May 24 Tr. 129:5-15.

What is clear is that the Debtor in 2012 was indeed obligated under the Guarantee that had been assigned to WEXA, and that the language of the WEXA Settlement (reproduced above) definitively denied the Debtor a release. Plaintiff's Exhibit 2 / Defendant's Exhibit H ¶ 10.

Other liabilities, though difficult to quantify, also existed. For example, the Debtor's 2018 schedules reflect 2009 tax claims by the New York State Department of Taxation in excess of $116,000 and 2010 and 2011 tax claims by the Internal Revenue Service (the "IRS") in excess of $19,000. Plaintiff's Exhibit 5, generally; Defendant Exhibit K, pgs. 23-25. The Trustee testified that the Debtor, starting in 2008, commenced several litigations, many of which led to counterclaims where the counterclaiming party ultimately prevailed, resulting in significant judgments against the Debtor. Pereira Decl. ¶ 10; May 23 Tr. 105:20-23. While the Debtor testified to being party to these various litigations, he also confirmed that these judgments were largely entered after 2012, May 24 Tr. 69:16-19, and thus were merely contingent claims as of the execution of the September 2012 Note and the 160 Chambers Mortgage.

In terms of assets, the Debtor testified that his only unencumbered assets in September 2012—other than any equity value in the 160 Chambers Co-Op—were "$12,500 in accounts receivable from his law practice," as "all of his significant assets were fully encumbered as collateral for a loan [he] took out in order to purchase a block in Red Hook, Brooklyn." Debtor Decl. ¶ 10. The Debtor testified that at that time, before the 160 Chambers Mortgage was executed, the 160 Chambers Co-Op was worth approximately $1.50 million, and encumbered by approximately $1.12 million in obligations—a first lien of approximately $812,000 held by Banco Popular and a second lien of approximately $300,000 held by Jeff Weber, both assignees from the original obligation holders—leaving only about $380,000 in equity in the property. Debtor Decl. ¶ 11; May 23 Tr. 239:9-22. The Debtor's Schedules fail to provide any additional insight into his income or investments at that time. The Plaintiff did not introduce into the record either a balance sheet for 2012 or 2013 for the Debtor or a statement for any of the Debtor's bank accounts from 2012 or 2013, nor any evidence other than the Debtor's testimony, the Debtor's Schedules, and proofs of claim as to the Debtor's income, assets, and liabilities during those years. Defendant Exhibit K, generally.

  II.   Discussion

      A.  Statute of Limitations

8

The Debtor filed for relief under chapter 7 of the Bankruptcy Code on November 27, 2018. The applicable statute of limitations for fraudulent transfers is six years under New York's Civil Practice Law and Rules ("CPLR"). N.Y. C.P.L.R. § 213.[2] It is not disputed that New York fraudulent transfer law applies to the transaction under Bankruptcy Code section 544(b). However, the parties disagree as to whether (a) the execution of the September 2012 Note and the granting of the 160 Chambers Mortgage and (b) the filing of a UCC-1 financing statement with respect to 160 Chambers Collateral are two separate transactions or collapsible into one transaction. If they are two separate transactions, then the 160 Chambers Lien on the 160 Chambers Collateral was granted on the perfection date in or around April 2013, which is well within the six-year statute of limitations for commencement of this action. If the execution and recordation are collapsed into one transaction, then the 160 Chambers Lien on the 160 Chambers Collateral is deemed to have been granted at the time of the execution of the September 2012 Note and therefore outside of the statute of limitations.

The analysis does not stop there, however. In the event that the transactions are collapsible, the Trustee asks the Court to determine that he may bring fraudulent transfer claims by stepping into the shoes of the IRS and therefore benefitting from the ten-year statute of limitations applicable to the fraudulent transfer claims under 26 U.S.C. § 6502.[3] This is generally referred to as the "golden creditor" issue, with the IRS as the golden creditor, or triggering creditor. The statutory basis is

---

[2] While CPLR § 213 generally outlines a six-year statute of limitations applicable for claims based on fraud, New York State case law has interpreted a distinction between the statute of limitations applicable for actual fraud claims versus constructive fraud claims. Thus, while actual fraud claims are governed by CPLR §213(8), which provides that "the time within which the action must be commenced shall be the greater of *six years* from the date the cause of action accrued *or two years* from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it" (emphasis added), claims brought under theories of constructive fraud are governed by the straight six-year statute of limitations provided in CPLR §213(1). *See Wall St. Assoc. v Brodsky*, 257 A.D.2d 526, 530 (1st Dep't 1999) ("New York law provides that a claim for constructive fraud is governed by the six-year limitation set out in CPLR 213 (1), and that such a claim arises at the time the fraud or conveyance occurs."), *see also Monaco v New York Univ. Med. Ctr.*, 213 A.D.2d 167, 168 (1st Dep't 1995) (noting that "the two-year discovery provision [of CPLR 213(8)] . . . does not apply to constructive fraud.").

[3] **(a) Length of Period**
Where the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the proceeding begun-
    **(1)** within 10 years after the assessment of the tax, or
    **(2)** if-
        **(A)** there is an installment agreement between the taxpayer and the Secretary, prior to the date which is 90 days after the expiration of any period for collection agreed upon in writing by the Secretary and the taxpayer at the time the installment agreement was entered into; or
        **(B)** there is a release of levy under section 6343 after such 10-year period, prior to the expiration of any period for collection agreed upon in writing by the Secretary and the taxpayer before such release.
If a timely proceeding in court for the collection of a tax is commenced, the period during which such tax may be collected by levy shall be extended and shall not expire until the liability for the tax (or a judgment against the taxpayer arising from such liability) is satisfied or becomes unenforceable.
**(b) Date when levy is considered made**
The date on which a levy on property or rights to property is made shall be the date on which the notice of seizure provided in section 6335(a) is given.

9

section 544(b)(1) of the Bankruptcy Code, whereunder a trustee may avoid, subject to an exception for charitable contributions, "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of [the Bankruptcy Code] or that is not allowable only under section 502(e) of [the Bankruptcy Code]." 11 U.S.C. § 544(b)(1).

        i. One Transaction or Two?

The first question for the Court is whether there were two separate transactions that occurred or whether the two transactions should be collapsed and constitute one transaction. Courts in the Second Circuit have applied a three-factor test to determine whether there is one transaction or two transactions: (i) "[w]hether all of the parties involved had knowledge of the multiple transactions"; (ii) "[w]hether each transaction would have occurred on its own"; and (iii) "[w]hether each transaction was dependent or conditioned on other transactions." *In re Tribune Company Fraudulent Conveyance Litigation*, 10 F. 4th 147, 163 (2d Cir. 2021) (citing *In re Sabine Oil & Gas Corp.*, 547 B.R. 503 (Bankr. S.D.N.Y. 2016), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016)).

As discussed above, on September 21, 2012, the Debtor executed the September 2012 Note and the 160 Chambers Mortgage. The Debtor did not file a UCC-1 financing statement contemporaneously with the execution of the 160 Chambers Mortgage and instead filed it on April 11, 2013.  The Debtor testified that the gap between the execution of the September 2012 Note and the filing of the UCC-1 financing statement was the result of him "screwing up" the paperwork and "having to go back to them and try and figure out the right way" to complete the recording several times, after his unsuccessful submissions were "rejected two or three times." Essentially, the Debtor explained, he "didn't get it all right."

Even though the two transactions—the execution and delivery of the September 2012 Note and the 160 Chambers Mortgage in September and the perfection of the 160 Chambers Lien on the 160 Chambers Collateral through the filing of the UCC-1 financing statement in April—took place approximately seven months apart, the facts support collapsing the two transactions into one transaction under the *Sabine* factors.  It is not clear from the testimony that Natoli was aware prior to the filing of the Complaint that there were two transactions.  The Debtor testified that he attempted to record the UCC-1 financing statement contemporaneously with the 160 Chambers Mortgage, meaning he intended it to be one transaction. The Debtor would not have recorded the UCC-1 financing statement perfecting his pledge of the 160 Chambers Collateral to Natoli but for the execution of the September 2012 Note.  Thus, the facts demonstrate that the second transaction would not have occurred on its own and that the second transaction was dependent on the first transaction.  Accordingly, this Court collapses the two transactions into one transaction which took place on September 21, 2012.  The encumbrance of the 160 Chambers Collateral falls outside of the six-year statute of limitations for fraudulent transfer actions under CLPR § 213.

10

ii. The Golden Creditor

To get around the six-year statute of limitations in CLPR §213, the Trustee brings this fraudulent transfer action utilizing the IRS as the triggering creditor, or golden creditor, under Bankruptcy Code section 544(b)(1). Section 544(b)(1) requires that a triggering creditor's allowable, unsecured claim date back from the time of the challenged conveyance. *In re Tronox Inc.*, 503 B.R. 239, 275 (Bankr. S.D.N.Y. 2013). There is no question that the Debtor had outstanding assessed tax liability and that the IRS was an unsecured creditor of the Debtor at the time of the transaction in September 2012.[4] Plaintiff's Exhibit 5, generally; Defendant Exhibit K, pgs. 23-25. The Trustee asserts that the ten-year statute of limitations in 26 U.S.C.§6502 applies to this action because the IRS had ten years from assessment under that statute to seek to avoid the transaction.

No Circuit Court of Appeals, including the Second Circuit, has ruled on the applicability of section 544(b)(1) and the "golden creditor" issue towards extending the statute of limitations for fraudulent conveyance actions. However, much case law supports its application.

For section 544(b)(1) to apply, the transfer at issue must be "voidable under applicable law" by the triggering creditor. 11 U.S.C. §544(b)(1). In the *Tronox* case, this Court held that the Federal Debt Collection Practices Act ("FDCPA") constitutes "applicable law" for purposes of section 544(b) and that a trustee can make use of the United States government's six-year statute of limitations for fraudulent conveyance actions under the FDCPA. *In re Tronox Inc.*, 503 B.R. 239, 273-274 (Bankr. S.D.N.Y. 2013). This Court further stated in dicta that the contention that the United States cannot be a triggering creditor is "without substance." *Id.* at 275 n. 44.

The majority of bankruptcy courts that have considered the question of whether 26 U.S.C. § 6502 may be utilized by a trustee as applicable law with the IRS as triggering creditor have held that the trustee may utilize the ten-year statute of limitations. *See, e.g.*, *In re Zagaroli*, No. AP 20-05000, 2020 WL 6495156 (Bankr. W.D.N.C. 2020); *In re Gaither*, 595 B.R. 201 (Bankr. D.S.C. 2018); *In re Kipnis*, 555 B.R. 877 (Bankr. S.D. Fla. 2016); *In re Kaiser* 525 B.R. 697 (Bankr. N. D. Ill. 2014); *In re Republic Windows & Doors, LLC,* 2011 WL 5975256 (Bankr. N. D. Ill. 2011); *In re Greater Southeast Cmty. Hosp. Corp. I,* 365 B.R. 293 (Bankr. D.D.C. 2006); *In re Emergency Monitoring Technologies, Inc.*, 347 B.R. 17 (Bankr. W. D. Pa. 2006); *In re Porras*, 312 B.R. 81 (Bankr. W. D. Tex. 2004). Indeed, 26 U.S.C. § 6502 provides that the IRS may collect taxes either by levy or by court proceeding initiated within ten years of the tax assessment. The statute does not specifically mention the ability of the IRS to collect taxes through a fraudulent transfer action

---

[4] The IRS filed a secured proof of claim in the amount of $88,978.89 [ECF Claim 11]. However, the attachment to the proof of claim indicates that the first notice of tax lien was filed on August 8, 2013. Thus, the lien of the IRS is junior to all other liens on 414 West 121 Street, Unit 4, New York, New York (the "414 West Property") and the 160 Chambers Co-Op. The 414 West Property was sold during the Case for a value which did not result in any funds being available to pay the IRS on account of its lien. The testimony about the valuation of the 160 Chambers Co-Op at the trial demonstrates that the IRS would not be able to realize any value on account of its lien with respect to the 160 Chambers Co-Op either. In the recent distribution to creditors made by the Trustee in the Case pursuant to an order of this Court, the IRS has an allowed unsecured claim in the amount of $6,600, a disputed priority claim in the amount of $30,000, and is not listed as a secured creditor [ECF 92]. Despite initially filing a secured proof of claim, the IRS's remaining claims against the Debtor are an allowed unsecured claim in the amount of $6,000 and a disputed priority claim in the amount of $30,000. Accordingly, the IRS is eligible under Section 544(b) to be a triggering creditor.

or acts to void a transaction. However, any action brought by the IRS as a creditor to void a transaction would have to take place in a court proceeding which would be covered under such statute.

At least one bankruptcy court has held that the trustee may *not* utilize the ten-year statute of limitations applicable to the IRS. In *Vaughan*, the bankruptcy court held that the trustee was constrained by the state statute of limitations applicable to fraudulent transfers. *In re Vaughan Co.*, 498 B.R. 297, 304-06 (Bankr. D.N.M. 2013).

Specifically, the *Vaughan* court held that the *nullum tempus* doctrine did not apply because the trustee is not sovereign and its actions do not protect the public interest. The *Vaughan* court further held that the IRS has unsecured claims in "a substantial portion of bankruptcy cases," and thus, allowing the trustee to step into the shoes of the IRS would practically render the state statutes of limitations moot. *Id.* at 305. The *Vaughan* court found that Congress could not have intended this policy consequence. *Id*. at 304.

The ancient doctrine known as *nullum tempus occurrit regi*, or "no time runs against the king," was recognized by the U.S. Supreme Court in *United States v. Summerlin*, where the Court held that "the United States is not bound by state statutes of limitations or subject to the defense of laches in enforcing its rights." 310 U.S. 414, 416 (1940). The Ninth Circuit Court of Appeals, along with other lower courts, has specifically held that the *Summerlin* rule applies to fraudulent transfer actions brought by an unsecured government creditor (the IRS) against a transferee of the taxpayer and that the IRS is not bound by the applicable state statute of limitations. *See, e.g., Bresson v. Comm'r*, 213 F.3d 1173, 117–79 (9th Cir. 2000); *United States v. Jepsen*, 131 F. Supp. 2d 1076, 1087–88 (W. D. Ark. 2000); *United States v. Bantau*, 907 F. Supp. 988, 991 (N. D. Tex. 1995).

The Court finds the first argument in *Vaughan* unpersuasive. It is well established that suits by a trustee under section 544(b) are derivative because the trustee is stepping into the shoes of a creditor. As the Court in *In re Kaiser* noted "[t]he unsecured creditor's ability to trump the applicable state statute of limitations might derive from its sovereign immunity, ... the estate representative's ability to override that same limitation derives from § 544(b)." *In re Kaiser*, 525 B.R. 697, 713 (Bankr. N.D. Ill. 2014) (quoting *In re Greater Southeast Cmty. Hosp.*, 365 B.R. at 304). Accordingly, "[t]he focus of the court in determining who is acting in a 'governmental capacity' is the unsecured creditor, not the estate representative." *In re Kaiser*, 525 B.R. 697, 713.

The second argument in *Vaughan* is based solely on policy considerations. When the law is clear, the Court need not look to the underlying policy. *United States v. Ron Pair Enters.*, 489 U.S. 235, 240-41 (1989) ("[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute."). Section 544(b) refers to "applicable law" and does not limit applicable law to state fraudulent transfer law. So, the Court finds that the statutory interpretation is clear and has not taken into account any policy considerations.[5]

---

[5] The Court notes that there are various policy considerations. A bankruptcy filing precludes IRS and other creditors of the debtor from bringing a fraudulent transfer action and only the estate representative can bring such an action on

12

The Court follows the majority of bankruptcy courts that have decided this issue and finds that the applicable statute of limitations with respect to this action is ten years from the date of assessment of the relevant taxes. Based upon the proof of claim filed by the IRS in the Case and section of 544(b) of the Bankruptcy Code, the Court finds that the statute of limitations applicable to the remaining causes of action in the Complaint had not expired prior to the commencement of the Debtor's bankruptcy proceeding. The Court now turns to the merits of the currently contested Counts in the Complaint.

### B. Count VI - Actual Fraudulent Conveyance Under NYDCL § 276

The Trustee alleges in Count VI of the Complaint that the September 2012 Note and encumbrance of the 160 Chambers Collateral were a fraudulent conveyance under section 276 of the NYDCL. Section 276 provides that:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

NYDCL § 276.

To prevail on a claim of actual fraud under section 276 of the NYDCL, the Trustee must prove by clear and convincing evidence that the transfer was made by the Debtor with actual intent to hinder, delay, or defraud. *In re APCO Merch. Servs., Inc.,* 585 B.R. 306, 320 (Bankr. E.D.N.Y. 2018). Proof by clear and convincing evidence means that when all of the evidence is considered, the trier of fact is convinced that it is highly probable that it is true. *Id*. In examining claims under this provision of the NYDCL, the intent of the transferor, rather than the transferee, is dispositive. *Id*. (citing *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059 n. 5 (2d Cir. 1995)). "Where actual intent to defraud is proven, the conveyance will be set aside regardless of the adequacy of the consideration given." *In re APCO Merch. Servs.*, 585 B.R. at 320.

Courts consider the evidence put before them to try to determine the transferor's intent. Plaintiffs may meet their burden not only by providing direct proof, but also by "provid[ing] allegations that amount to circumstantial evidence from which the requisite intent may be inferred." *In re Vivaro Corp.*, 524 B.R. 536, 554 (Bankr. S.D.N.Y. 2015). "Under New York law, such circumstantial evidence is known collectively as the 'badges of fraud,' and may include: [1] a close relationship between the parties to the conveyance; [2] inadequacy of consideration received; [3] retention of control of the property by the transferor; [4] suspicious timing of the conveyance after the debt was incurred; [5] the use of fictitious parties; [6] information that the transferor was insolvent as a result of the conveyance; [7] the existence or cumulative effect of a

---

behalf of the debtor. If the *Vaughan* court decision were followed, then both the IRS and a trustee would be precluded from bringing a fraudulent transfer action if the transaction took place outside of the state law look back period but within the ten-year statute of limitations applicable to the IRS. Admittedly, this Court's decision and the decisions by the majority of bankruptcy courts with respect to the "golden creditor" issue open up the look back period with respect to potentially voidable transactions to a much longer period of time than provided for under state fraudulent transfer law since the IRS is a creditor in many bankruptcy cases. That concerns the Court, but such policy considerations are solely within the purview of Congress.

13

pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; [8] the general chronology of the events and transactions under inquiry; [9] a questionable transfer not in the usual course of business; and [10] the secrecy, haste, or unusualness of the transaction." *Id.*

Out of the ten badges of fraud described in *Vivaro*, only three badges of fraud are present based upon the evidence put before the Court. First, there is a close relationship between the Debtor and Natoli, as they have, since their divorce, maintained an amicable relationship for the benefit of their three (now-adult) children. Natoli Decl. ¶ 7; May 23 Tr.213:23-24; 214:1-9. Second, as discussed below in Section II.C.i., this Court finds that the consideration received by the Debtor in the transaction was not fair consideration and therefore is inadequate consideration. Third, after the transaction occurred, the Debtor as the transferor continued in control of the 160 Chambers Co-Op, the Proprietary Lease, and the 160 Chambers Shares. However, there was little to no evidence in the trial record supporting the remaining badges of fraud. Without enough persuasive evidence, the Court finds that the Trustee has failed to meet his burden of proof with respect to section 276 of NYDCL in Count VI of the Complaint.

      C. Count III - Constructive Fraudulent Conveyance Under NYDCL § 273 (Rendered Insolvent)

The next question the Court takes up is whether, as alleged in Count III of the Complaint, the transfers constituted constructive fraudulent conveyance under section 273 of the NYDCL. Section 273 provides that:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

NYDCL § 273.

As the Second Circuit noted in *United States v. Watts*, "the element of insolvency is presumed when a conveyance is made without fair consideration, and the burden of overcoming such presumption is on the transferee." *United States v. Watts*, 786 F.3d 152, 165 (2d Cir. 2015); *see also Feist v. Druckerman*, 70 F.2d 333, 334 (2d Cir. 1934) ("[T]here is a rule of long standing in the New York courts that a voluntary conveyance made when the grantor is indebted is presumptively fraudulent. We think this means that, if one indebted makes such a transfer, it is presumed, in the absence of some proof to the contrary, that he was then insolvent."). "When this presumption arises, the burden shifts to the transferee to come forward with proof of the transferor's solvency." *In re Khan*, 2014 WL 10474969, at *9 (E.D.N.Y. Dec. 24, 2014). Accordingly, the Court first considers whether the element of fair consideration has been met under NYDCL.

14

i. Fair Consideration Under NYDCL § 272

Section 272 of the NYDCL provides that:

> Fair consideration is given for property, or obligation,
>
> a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
>
> b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

NYDCL § 272.

As the Court explained in *In re Direct Access Partners, LLC*, "[t]he definition of 'fair consideration' under the [NYDCL] [] incorporates concepts of 'value' as well as concepts of 'good faith.'" *In re Direct Access Partners, LLC*, 602 B.R. 495, 547 (Bankr. S.D.N.Y. 2019). The definition of "fair consideration" "has the same fundamental meaning" as the definition for "reasonably equivalent value" under the Bankruptcy Code, as both are "interpreted similarly by the courts." *In re Churchill Mortg. Inv. Corp.*, 256 B.R. 664, 677 (Bankr. S.D.N.Y. 2000). The concept of "fair consideration" can be understood to consist of three requirements: (1) that the "recipient of the debtor's property either . . . convey property in the exchange or . . . discharge an antecedent debt in exchange," (2) that "such exchange [] be a fair equivalent of the property received," and (3) that such exchange be in good faith. *Watts*, 786 F.3d at 164; *In re Sharp Intern. Corp.*, 403 F.3d 43, 54 (2d Cir. 2005). This concept is "an elusive one that defies any one precise formula," as "what constitutes fair consideration [] must be determined upon the facts and circumstances of each particular case." *U.S. v. McCombs*, 30 F.3d 310, 326 (2d. Cir. 1994); *see also Lippe v. Bairnco Corp.*, 249 F.Supp.2d 357, 377 (S.D.N.Y. 2003) (explaining that the question of whether "fair consideration" exists is a fact intensive question that must be determined on a "case-by-case basis").

Natoli's argument is that the September 2012 Note, the 160 Chambers Mortgage, and the UCC-1 financing statement encumbering the 160 Chambers Collateral were given as fair consideration because the Debtor had agreed in the Realty Operating Agreement to reimburse Natoli for any amount paid by Natoli with respect to amounts owed by Realty in excess of Natoli's thirty (30) percent ownership interest in Realty. Natoli Decl. ¶ 19; 30; May 23 Tr. 125:24-126:5; 128:16-18; 207:18-208:13; 229:19-22. The Debtor also testified at the trial that this was his understanding as well. Debtor's Decl. ¶ 8; May 23 Tr. 229:15-22.

The Court does not find that argument persuasive. Natoli's initial capital contribution to Realty included the Guarantee that she executed with respect to the Realty Loan, and a pledge of the 49 Warren Condo as collateral for the Loan and her obligations under the Guarantee. Schedule A to the Realty Operating Agreement specifically says: "NICOLENA OMANSKY is receiving 30% of the shares in consideration for placing her unit as additional collateral for said loan and will be personally guaranteeing said loan." Plaintiff's Exhibit 1/Defendant Exhibit A at Schedule A.

15

However, Schedule A also states that "LAWRENCE A. OMANSKY, is receiving 50%[6] of the deal because he is guaranteeing said [L]oan, has arranged for the purchase of the unit, the sale of the unit, and will cover any losses over and above members initial investment." Plaintiff's Exhibit 1/Defendant Exhibit A at Schedule A.

The Court finds that the Realty Operating Agreement is clear that any obligation that the Debtor might have on Schedule A of the Realty Operating Agreement to pay losses is only over and above members' initial investment.[7] Natoli's initial investment in Realty was her pledge of the 49 Warren Condo as collateral for the Realty Loan and her personal guaranty of the Realty Loan. There is no dispute about that. Natoli's personal guaranty was not limited in amount and so she was personally liable for the entire amount of the Realty Loan. Similarly, her pledge of the 49 Warren Condo was collateral pledged to secure repayment of the entire amount of the Realty Loan. Accordingly, there is no basis, even under the language in Schedule A of the Realty Operating Agreement, for the argument that the Debtor owed Natoli any amount with respect to the Realty Loan and/or the pledge of the 49 Warren Condo. Thus, as of the date of the transaction, September 21, 2012, Natoli was not owed any amount by the Debtor under Schedule A of the Realty Operating Agreement.[8]

Since there was no antecedent debt due and owing by the Debtor to Natoli at the time of the transaction, the Court finds that fair consideration was not given in exchange for the September 2012 Note and the pledge of the 160 Chambers Collateral by the Debtor.

### ii. Insolvency Under NYDCL § 273

This Court finds that there was not fair consideration given with respect to the transaction. Therefore, under *United States v. Watts*, the Defendant must rebut the presumption that the Debtor was insolvent at the time of the September 2012 Note and 160 Chambers Mortgage transaction or rendered insolvent by the transaction. *See Watts*, 786 F.3d at 165.

Section 271 of the NYDCL provides:

> (a) A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets.
>
> (b) A debtor that is generally not paying the debtor's debts as they become due other than as a result of a bona fide dispute is presumed to be insolvent. The presumption imposes

---

[6] The Debtor's cited 50% ownership interest represents his holdings at the time of the execution of the Realty Operating Agreement, before acquiring the ownership interests of his brother and his former girlfriend.

[7] The Court notes that it is unclear under the Realty Operating Agreement that the Debtor is obligated to fund any losses incurred by the other members over and above their initial investment. Sections 8.1 and 8.9 of the Realty Operating Agreement make it clear that members are obligated to make additional capital contributions and that the managing member who is the Debtor has no personal liability for the repayment of capital contributions for any member.

[8] The Court rejects Natoli's argument that, at the time of the transaction, the Debtor had a contingent obligation to her with respect to an amount in excess of 30% of any amount that she paid WEXA in settlement of the Realty Loan. Natoli Decl. ¶ 19; May 23 Tr. 128:16-18; 207:18-208:13. No settlement had been agreed to with WEXA as of September 21, 2012, let alone documented and signed, and Natoli had not made any payment to WEXA as of that date. However, a default on the Realty Loan had occurred prior to September 21, 2012, and so, at the time of the transaction, both Natoli and the Debtor were severally, not jointly, personally liable to WEXA for the entire unpaid balance of the Realty Loan under the terms of the Guarantees that each had executed.

on the party against which the presumption is directed the burden of proving that the nonexistence of insolvency is more probable than its existence.

(c) Assets under this section do not include property that has been transferred, concealed or removed with intent to hinder, delay or defraud creditors, or that has been transferred in a manner making the transfer voidable under this article.

(d) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

NYDCL § 271.

Despite section 271 of the NYDCL, there is no uniformly accepted test for determining insolvency, as some courts rely on the "equity" or "cash flow" test that asks whether the debtor is unable to pay debts as they become due, while others rely on a "balance sheet" test. *In re Centennial Textiles, Inc.*, 220 B.R. 165, 173-74 (Bankr. S.D.N.Y. 1998). While New York courts have not drawn a distinction between these tests, the District Court for the Southern District of New York has stated that the standard to be applied under section 271 of the NYDCL is "insolvency in the bankruptcy sense," which "focuses on the balance sheet of a company at discreet intervals of time in order to determine whether the company's liabilities exceed its assets" and "will typically be met by companies in serious financial difficulty." *Id*., at 174 (citing *U.S. v. 58th St. Plaza Theatre, Inc*., 287 F. Supp. 475, 500 (S.D.N.Y. 1968)).

From the record before the Court, it is not easy to determine whether the Debtor was insolvent at the time of the transaction under either test. Because the Debtor is an individual, there is no contemporaneous balance sheet or income statement which appears to exist or was made part of the evidentiary record. Indeed, the Court has little information about the Debtor's income in 2012. The Court knows that the Debtor was a practicing criminal attorney and that there were receivables from that business. Debtor Decl. ¶ 10; May 23 Tr. 29: 4-5; 243:10-11. There is no evidence in the record that the Debtor had any positive cash flow in 2012 from his real estate development business.

It is up to the Defendant to prove that the Debtor was not insolvent at the time of the transaction. For the reasons set forth below, the Defendant has failed to prove that the Debtor was not insolvent at the time of the transaction.

With respect to the balance sheet test, the testimony at trial was that, at the time of the transaction in September 2012, the Debtor's only unencumbered assets—other than any equity value in the 160 Chambers Co-Op—were "$12,500 in accounts receivable from [his] law practice and various personal possessions such as household furnishings," as "[a]ll of [his] other significant assets […] were fully encumbered as collateral for a loan [he] took out in order to purchase a block in Red Hook, Brooklyn." Debtor Decl. ¶ 11. This testimony was not controverted by the Defendant.

The Debtor further testified that before the 160 Chambers Mortgage was executed, the 160 Chambers Co-Op was worth approximately $1.50 million, and encumbered by approximately $1.12 million in obligations— a first lien of approximately $812,000 held by Banco Popular and

17

a second lien of approximately $300,000 held by Jeff Weber, both assignees from the original obligation holders—leaving only about $380,000 in equity in the property. Debtor Decl. ¶ 11; May 23 Tr. 239:9-22. There was no independent evidence of valuation of the Debtor's assets in September 2012 provided by either party at the trial. Indeed, there was no evidence in the record other than the Debtor's testimony about his assets in September 2012, the valuation of his assets at that time, and the extent to which his assets were encumbered prior to the transaction.

With respect to liabilities of the Debtor in existence as of September 2012, in addition to the liabilities relating to his real estate business secured by liens on the Debtor's property, the evidence demonstrates that there were unpaid taxes due and owing by the Debtor which are still due and owing. The Schedules filed by the Debtor in his Chapter 7 case list claims by the New York State Department of Taxation for unpaid 2009 taxes in excess of $116,000 and 2010 and 2011 claims by the IRS for unpaid taxes in excess of $19,000. Plaintiff's Exhibit 5, generally; Defendant Exhibit K, pgs. 23-25.

At the time of the transaction, after application of the proceeds from the sale of the 49 Warren Penthouse, there was a $3.191 million deficiency balance on the Realty Loan. The Debtor had executed a personal guaranty of the Realty Loan and so was individually liable for the entire deficiency balance under the terms of the Guarantee. Natoli Decl. ¶ 17; Debtor Decl. ¶7; May 23 Tr. 52:4-5; May 24 Tr. 24:1-3. Based on the Debtor's testimony, in September 2012, he did not have $3.191 million of cash or other unencumbered assets with which to pay this debt. In fact, the Debtor never made any payments to WEXA on account of his obligation under the Guarantee. May 23 Tr. 234:11-13.

Based upon the record before the Court, the Debtor's liabilities appear to have exceeded the value of his assets by a significant amount at the time of the transaction. Thus, the Debtor appears to have been insolvent in September 2012 applying the balance sheet test. In addition, the Debtor appears to have been insolvent on a cash flow test in September 2012 since he was unable to pay his tax liabilities from 2009, 2010, and 2011 which still remain unpaid, and he was unable to pay the amount due to WEXA under his personal guaranty of the Realty Loan. However, the applicable test is whether, based upon the evidentiary record from the trial, the Defendant was able to rebut the presumption of the Debtor's insolvency at the time of the transaction. And the answer to that question is no.

The Court finds in favor of the Trustee with respect to Count III in the Complaint.

> D.  Count IV – Constructive Fraudulent Conveyance Under § 274 (Unreasonably Small Capital)

With respect to Count IV of the Complaint, constructive fraudulent conveyance under section 274 of the NYDCL, the applicable section provides that:

> Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

18

NYDCL § 274.

A claim under section 274 of the NYDCL requires proof that "at the time of the transfer the debtor was engaged or about to be engaged in a business or transaction." *Khan*, at *18. The statute is inapplicable where the debtor is not engaged in, or about to engage in, business or a transaction that requires capital at the time of the transfer in question. *Id.*; *In re Williams' Estate*, 179 Misc. 805, 39 N.Y.S.2d 741 (Sur. Ct. 1942). The Bankruptcy Court for the Eastern District notes that this provision "appl[ies] to individual and corporate debtors alike." *Khan*, at *18 (citing *Laco X–Ray Sys., Inc. v. Fingerhut*, 453 N.Y.S.2d 757, 762 (App. Div. 2d Dep't 1982) ("The Debtor and Creditor Law applies to individual and corporate debtors alike")). The evidentiary record demonstrates that the Debtor was engaged in two businesses at the time of the transaction, a criminal law practice and real estate development, so this element is met.

With respect to the element of "unreasonably small capital," the trustee bears the burden of proving that a debtor had unreasonably small capital. *See In re Vivaro Corp.*, 524 B.R. at 551.

"[The unreasonably small capital] test denotes a financial condition short of equitable insolvency, and is aimed at transferees that leave the transferor technically solvent but doomed to fail." *In re Operations NY LLC.*, 490 B.R. 84, 98 (Bankr. S.D.N.Y. 2013) (internal citations omitted). The Second Circuit noted in *In re Adelphia Communications Corp.* that "[t]he test for whether assets are 'unreasonably small' focuses on reasonable foreseeability and is satisfied if at the time of the transaction the debtor had such minimal assets that insolvency was inevitable in the reasonably foreseeable future." *In re Adelphia Commc'ns Corp.*, 652 F. App'x 19, 21 (2d Cir. 2016) (citing *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir. 1992)). The applicable case law supports an unreasonably small capital finding where the debtor is not insolvent at the time of the transaction but where the debtor is likely to become insolvent in the near term because of the transaction in question.

The Court held that the evidentiary record supports a finding that the Debtor was insolvent at the time of the transaction and that the transaction was a fraudulent conveyance under section 273 of the NYDCL and section 544(b)(1) of the Bankruptcy Code. Accordingly, the Court finds that, because the Debtor was insolvent already at the time of the transaction, section 274 of the NYDCL and Count IV of the Complaint are inapplicable.

> E. Count V - Constructive Fraudulent Conveyance Under NYDCL § 275 (Ability to Pay)

With respect to Count V of the Complaint, constructive fraudulent conveyance under section 275 of the NYDCL, the applicable section provides that:

> Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

NYDCL § 275.

19

Although section 275 of the NYDCL does not require proof of intent to defraud, the "ability to pay" financial test requires proof of the transferor's subjective intent or belief that it will incur debt it cannot pay at maturity. *In re Wonderwork, Inc.*, 611 B.R. 169, 212 (Bankr. S.D.N.Y. 2020). There is nothing in the evidentiary record which demonstrates that it was the Debtor's belief when he signed the September 2012 Note that he would be unable to repay the $900,000 debt to Natoli. Accordingly, the Court finds that the Trustee has not sustained his burden of proof with respect to Count V of the Complaint.

III.    Judgment

The Court requests that, with respect to Count III of the Complaint, the Trustee submit a proposed form of judgment regarding the avoidance and preservation of the 160 Chambers Lien given by the Debtor to the Defendant to secure the September 2012 Note for the benefit of the Debtor's estate.

Dated: New York, New York
      September 15, 2022

                              */s/ Lisa G. Beckerman*
                              **HON. LISA G. BECKERMAN**
                              **UNITED STATES BANKRUPTCY JUDGE**